13946

SARRATT *ET AL.* v. HOLSTON QUARRY CO. OF SOUTH CAROLINA *ET AL.*

(177 S. E., 135)

*Messrs. Osborne & Butler,* for appellant,

*Mr. G. W. Speer,* for appellant,

*Messrs. Wolfe & Fort* and *Nicholls, Wyche & Russell,* for respondents,

November 15, 1934.

The opinion of the Court was delivered by Mr. Justice Carter.

This suit, commenced in the Court of Common Pleas for Cherokee County, December 27, 1932, by Pearl Sarratt and M. A. Sarratt, as administrators of the estate of Carroll Sarratt, deceased, plaintiffs, against Holston Quarry Company of South Carolina and Lockhart Power Company, defendants, is an action brought under Lord Campbell's Act

for recovery of damages alleged to have been sustained by the widow and children of the said Carroll Sarratt, on account of his death, which occurred on or about the 16th day of October, 1932, caused, according to plaintiffs' allegations, by the tortious and wrongful conduct of the defendants. The defendants denied liability. Issues being joined, the case was tried at the March, 1933, term of said Court before Judge J. Henry Johnson and a jury, resulting in a verdict in favor of the plaintiffs against both of the defendants in the sum of $10,000.00. From the judgment entered on the verdict returned by the jury, the defendants, pursuant to due notice, have appealed to this Court.

The allegations of error imputed to the trial Judge by the appellants are stated under thirty-three exceptions, twenty-nine presented by the appellant Holston Quarry Company of South Carolina and four presented by Lockhart Power Company, but, as stated in the brief of counsel for appellants, the following are the issues involved in the appeal:

"(1) Error in the admission of testimony.

"(2) Error in refusing a motion for nonsuit on various grounds.

"(3) Error in refusing to direct a verdict for appellant on various grounds.

"(4) Error in certain portions of the charge of the trial Judge to the jury, and of the refusal of the trial Judge to charge certain requests of the appellant."

For the purpose of an understanding of the issues involved, at this juncture we shall state, in substance, the principal facts alleged by the plaintiffs as set forth in their complaint and upon which testimony was introduced.

Plaintiffs allege, in effect, that Carroll Sarratt died, intestate, about the 16th day of October, 1932, leaving as his only heirs his widow, Pearl Sarratt, and the following named children: Harry, age 17; Ruby, age 15; Claude, age 12; and Ruth Sarratt, age 2 years; that in October, 1932, Pearl Sarratt and M. A. Sarratt were duly appointed ad-

ministrators of the estate of the said Carroll Sarratt, deceased, and that the action is brought for the benefit of the widow and children of the said deceased; that the defendant Lockhart Power Company, a corporation, is engaged in generating, transmitting, and vending electric power in this State with officers and agents in the said County of Cherokee, and that Holston Quarry Company is a corporation under the laws of South Carolina engaged in mining and quarrying stone, and owns and operates a stone quarry in said County of Cherokee at the edge of the City of Gaffney; that Holston Quarry Company makes extensive use of electricity in connection with operating its plant for power and lighting and to pump water from the quarry, and, prior to the death of the intestate, it entered into an agreement or arrangement whereby the Lcokhart Power Company was to furnish and supply its electric needs and requirements from Lockhart Power Company's wire; that, in order to carry out the said agreement or arrangement, the defendants constructed of from the main power line of the Lockhart Power Company, "which stretches alongside of Limestone College in the populous outskirts of the City of Gaffney, a short spur line consisting of two bare, uninsulated copper wires, each heavily freighted with electricity of a deadly voltage, negligently and dangerously attached to short cross arms erected upon the top of a row of wooden poles stretching from 75 to 100 yards over into and upon the edge of said quarry to a certain metal shed, where the said uninsulated wires and other wires connected therewith, were dangerously and negligently arranged in such a careless and hazardous manner in and about the poles immediately contiguous to said shed, where the switch, hereinafter described, was located, and in and about the shed as to constitute them an everpresent danger to the lives of those persons moving in and about the said pole or shed, and that over this said spur power line, the defendant, Lockhart Power Company, at the instance of its co-defendant frequently and continu-

ously transmitted, as needed or required, electricity of a high, deadly and dangerous voltage over the defective and dangerous equipment without taking any precaution to insulate the wires or to prevent the highly dangerous electric current being transmitted thereon from coming into contact with the persons employed in said quarry."

The plaintiffs further allege, in this connection, that the defendants prepared and "erected two switches and connections, by the use of which the electric current being transported from the main line of the defendant Lockhart Power Company over the aforesaid spur line might be cut off or discontinued; that one of the switches prepared for such discontinuance was located within the quarry of the defendant Holston Quarry Company by the aforesaid metal shed, and that the other connection or switch was located at the junction of the main line of the defendant Lockhart Power Company with the said short line stretching over into the quarry, and that each of said switches necessarily was often used by the employees of the defendant Holston Quarry Company of South Carolina," and on information and belief the plaintiffs further allege that, although the defendants were fully apprised of the dangers incident to the switches referred to, they have maintained the same uninsulated and surrounded with wires surcharged with heavy and dangerous electric voltage, so much so that one who is not fully acquainted with the danger and thoroughly conversant with the character of electric current cannot use either of said switches without the most serious danger and hazard to his life; that on the night of October 16, 1932, one J. H. Champion, an employee and servant of the defendant Holston Quarry Company of South Carolina, in the regular scope of his employment, under the direction of his master, and in the exercise of due care, was about the said metal shed and the switch adjacent thereto; that, due to the uninsulated character of the numerous heavily charged wires leading to and about the said switch and shed, and the faulty con-

struction and location of the same, the whole territory about the shed and switch was heavily and dangerously charged with electricity on the night in question, which was marked by damp and inclement weather; and that as the said J. H. Champion, in the exercise of due care, and without any knowledge or any forewarning of the danger, approached the said shed and switch in the customary manner as required by his employment, he was dangerously and seriously shocked and burnt about his body, all as a direct and proximate result of the said joint and concurrent negligence, recklessness, and willfulness of the defendants, and, as the said J. H. Champion lay about the said switch and shed, dangerously and seriously hurt, in great need of immediate medical care and attention and beseeching help and assistance, those who heard his cries and were acquainted with his needs of immediate attention feared to approach him or render him any assistance on account of the presence of heavily charged electricity, negligently allowed and permitted to surround the said injured employee by the defendants herein; that, before any assistance could be given the said injured employee, it was necessary to cut off the electricity being transported along the said spur line, and thus remove the dangerous electricity which surrounded him and prevented the approach of any one to his assistance, which discontinuance could only be accomplished by cutting the said electricity off at the junction of the quarry line with the main line of the defendant Lockhart Power Company; that, although deceased was weary from a hard day's labor, and in spite of the disagreeable weather, upon learning of the real and immediate peril of the said employee, the said J. H. Champion, he immediately came to the assistance of said employee, and, in order to extricate him from a position of real peril, and in order to enable medical assistance to be given such employee, and in order to end the dangerous nuisance created by the defendants about the said metal shed and switch, rushed from his home to the scene of employ-

ee's peril and began endeavoring to cut off the electricity at the junction of the said lines mentioned; that the said switch, as stationed at said junction, was located upon an upper crossbar about 15 or 20 feet up a large wooden pole; "that surrounding such switch on every hand were numerous dangerous wires heavily charged with electricity; that although the defendants both knew and intended that the said switch should be repeatedly used to discontinue and inaugurate the flow of electric current from the main lines of the defendant Lockhart Power Company into the quarry, the defendants negligently, recklessly, willfully and wantonly so arranged such switch upon the said pole as to surround the same with dangerous electric charges and to render it a vertiable death trap, and attached the electric wires which were placed about such switch to equipment of such inferior and defective character as to cause deadly electric current to surround such switch, and thus to prevent anyone from using said switch except with the most serious danger to their life"; that, as the plaintiffs' intestate began climbing the pole upon which the said switch was located, in an attempt to rescue the said J. H. Champion from his real and immediate peril, and to end the aforesaid nuisance, and as he approached the said switch, the deadly electric current with which the defendants had negligently, recklessly, and willfully surrounded the said switch and the pole upon which it was located, "suddenly struck plaintiffs' intestate, causing him to fall from said pole, and thus inflicting upon him the injuries from which he directly and shortly thereafter died."

Upon the aforesaid alleged state of facts, the action is based and, as stated, damages asked for for the benefit of the widow and children of the said deceased. In this connection the plaintiffs, upon information and belief, further allege that the death of the said Carroll Sarratt was directly due to, and proximately caused by, the joint and concurrent negligence of the defendants, Holston Quarry Company of

South Carolina and Lockhart Power Company, in the following particulars:

"(a) In so arranging and preparing the wires charged with electricity in and about the switch and metal shed located in said quarry as to fill the whole territory about said switch and shed with deadly charges of electric current, highly dangerous to anyone approaching either shed or the said switch.

"(b) In creating in and about said shed and switch a nuisance of the greatest danger and hazard to human life.

"(c) In placing its dangerous electric wires about the said shed and switch upon glass insulators of such a defective quality and type that they failed in any wise to prevent the said deadly electricity from escaping from such wires, and thereby creating about the said switch a dangerous and perilous nuisance.

"(d) In failing to properly insulate the wires which surrounded the said switch and shed as a proper regard for the lives of those who would be expected to approach or use the same would have required.

"(e) In negligently and wilfully fixing the said switch in such a manner that in wet weather the same could not either be used or approached by anyone without receiving charge of deadly electric current.

"(f) In attaching about the uninsulated wires located adjacent to and in and about the said switch a cord and metal guy wire, both of which are excellent conductors of electricity, and both of which operated by reason of their proximity to the said uninsulated wires to create about the said switch and shed a death trap and a dangerous nuisance.

"(g) In failing to take any precautions or exercise any care to protect those who might properly be in and about said shed and switch from the deadly and highly dangerous electricity which the defendants transmitted to and surrounded said shed and switch with.

"(h) In permitting the atmosphere about said switch and

shed to be so charged with electricity that one who approached the same would be dangerously injured, and in failing to warn those who might be expected to come upon said premises, or to be thereabouts, of such dangers.

"(i) In erecting and maintaining upon said premises in and about said switch and shed a dangerous nuisance inimical to human life.

"(j) In maintaining said shed and switch and dangerous territory thereabout open and uncovered, and in failing to fence about the same, and to post conspicuous signs thereabout to warn and notify all persons coming thereabouts of the death trap there created.

"(k) In failing to warn or apprize those who had occasion to be about said shed and switch of the dangers incident to and surrounding the same.

"(l) In so surrounding the switch located upon the pole at the juncture of the main power line and the power line leading to the quarry with deadly electric wires, all heavily laden with electricity of a dangerous voltage so that one could not approach or draw near unto said switch or shed without being seriously and dangerously hurt and injured with electricity.

"(m) In failing to insulate the wires carrying electricity of dangerous voltage and surround said switch so one could not approach or use said switch without being seriously injured.

"(n) In using in and about said switch and in and about the pole upon which the switch was located defective equipment whereby the atmosphere about such switch was so surcharged with dangerous electricity that the switch located upon such pole could not be used without serious injury to those attempting in a careful and proper manner to use the same.

"(c) In failing to warn or apprize anyone of the dangers incident to the use of the switch located upon the said pole.

"(p) In failing to take any precaution or exercise any care in order to avoid injury to either Champion, under the circumstances under which he was injured, or to plaintiffs' intestate.

"(q) In that they failed to furnish their employees with a reasonably safe place in which to work."

In answering the complaint, the defendant Holston Quarry Company of South Carolina admitted the death of the said Carroll Sarratt, on the date named, October 16, 1932; admitted that it is a South Carolina corporation, and at the time alleged was engaged in quarrying at a quarry in the suburbs of Gaffney; that there was constructed a short spur line of wires from the Lockhart Power Company's main power line across to this defendant's plant, which wires carried electric power for the use of this defendant, that is, according to its allegations. This defendant also admits in its answer that there was a switch on said spur line near this defendant's plant, by means of which, according to its contention, the current on said line could easily be cut off, and it admits that it was possible for the current to be cut off of said line at the junction of said line with the main lines of the Lockhart Power Company. This defendant also admits that the power wires were not insulated; and also admits that, on the date mentioned, the said Champion was its employee, and while at its plant suffered some disability. This defendant also admits that the said Carroll Sarratt climbed, or attempted to climb, a power pole, from which he fell, receiving injuries from which he died, on the date alleged by the plaintiffs. This defendant denied all other material allegations of the complaint, and interposed the plea of contributory negligence and contributory willfulness on the part of plaintiffs' intestate, and alleged, further, in this respect that said intestate "voluntarily undertook to and did climb the said power pole while the same was wet and slick, in the night time, with full knowledge of the conditions of said pole and the surrounding conditions which made it danger-

ous to do so, and without equipping himself with spikes and a belt, so as to enable him to climb and handle himself with safety and avoid danger from slipping or coming in contact with wires or obstructions, and failed to protect himself with rubber gloves and other equipment, and failed to keep a proper lookout and take reasonable and suitable precaution for his own safety, such as the circumstances required, and his knowledge of the conditions made available and as a result thereof he suffered the injuries which brought about his fall from the said pole and his death." The defendant further alleged, on information and belief:

"That plaintiffs' intestate was an electrician of many years' experience, and was thoroughly familiar with the proper methods of climbing poles and of equipping himself with proper instrumentalities essential for that purpose; that he was familiar with the power lines and poles of the Lockhart Power Company and knew full well the means that were easily available for cutting off the electric current leading to this defendant's plant without incurring unnecessary risks, dangers and hazards; that he also knew full well the risks and hazards that were involved by his undertaking to climb a slick, wet pole in the darkness, in view of surrounding conditions and the dangers of falling or otherwise, without equipping himself with belt, with climbing spikes, rubber gloves, and without taking other necessary precautions for his own safety; and defendant is informed and believes that the said intestate did attempt to and did climb the slick, wet power pole in the rain and darkness, with full knowledge of the existing and surrounding conditions, impediments, and dangers, with full knowledge of the risks that were involved therein, without equipping himself properly and without taking proper precautions and keeping a proper lookout for his own safety, and without adopting methods and means whereby such dangers would have been eliminated, and by so acting and by so doing that the said intestate incurred the risks of all such alleged dangers or alleged de-

fects that may have operated to bring about his injuries and death."

The Lockhart Power Company, in its answer, admitted that it is a South Carolina corporation, but denied all other material allegations of the complaint. Further answering the complaint, the Lockhart Power Company set up defenses similar to the defense interposed by its codefendant Holston Quarry Company.

We shall consider first the question regarding the motion for a nonsuit.

The Lockhart Power Company based its motion for a nonsuit upon the ground that there is no testimony to show willfulness or negligence on its part; and the other defendant, Holston Quarry Company, stated the grounds of its motion thus: (1) On the ground that the evidence fails to show any actionable negligence on the part of the quarry company operating as the proximate cause of the injuries of the deceased; (2) that the testimony does show affirmatively that the death of the deceased, which was due primarily to a fall from the pole, was caused by an independent, intervening, efficient agency, that was brought about by no means that was within the control or caused by this defendant, but was produced and controlled by the power company.

The Holston Quarry Company also asked for nonsuit upon the following ground: "That the testimony shows, and no reasonable inference can be drawn to the contrary, that Mr. Champion suffered whatever injuries he may have suffered as a direct result of dangers and alleged defects that were open and obvious and known to him, and he therefore assumed the risks involved therein; and that being the case, anybody that came to his rescue had to take the situation as it actually was, and therefore our company wouldn't be liable by some mistake or lack of precaution on the part of Mr. Sarratt rushing to his assistance, in climbing this pole, and that couldn't be charged up as negligence on our part, on account of something that had been assumed by Champ-

ion himself incident to that. Under the provisions of the law we have, of course, the right to contract with Mr. Champion to do work of a dangerous character; we had the right to contract with him to do work in which were risks, even if it involved danger. If the Court could conclude it was danger negligently involved nevertheless, if there were dangerous defects, as a matter of law he assumed the risks involved in that, and under the law he couldn't recover. And incident to that, your Honor please, I wish to state our contention boiled down to a nutshell, that the direct immediate result of the death of Mr. Sarratt was coming in contact with a wire dangerously located on that pole, and of such a character that a prudent power company would be charged, under our laws, with a duty to safeguard against in the interest of anybody who had the right to be on that pole, and who they had reason to expect would come there. Now, I want to add the additional ground, your Honor, it escaped my mind for a moment. That is, that the testimony follows to the point, I think, where there could not be any question about it, that the dangers which did cause Mr. Sarratt's death were open, obvious, known to him, of such a character and so obvious, and so conspicuous that any man in the exercise of even slight care, any man with his eyes open in the exercise of slight care would have taken the precaution to equip himself in the way the experts say he ought to have been equipped."

The Holston Quarry Company also based its motion for nonsuit upon the ground that the intestate, in climbing the pole in question, incurred the risk incident thereto.

For the purpose of clearly and fully stating the position of the parties to the cause, we have quoted from the transcript at length.

The trial Judge granted the motion for nonsuit as to punitive damages, and that question is not before this Court.

As to actual damages, the record, in our opinion, supports his Honor's ruling in refusing to order a nonsuit.

As we view the case, it would serve no useful purpose to quote the testimony at length or to make a lengthy statement of the same, and we shall simply make reference to the portions or parts of the testimony we regard as material to the questions involved in the appeal.

It is conceded that Carroll Sarratt died, intestate, at the time alleged by the plaintiffs, leaving a widow and children, named in the complaint, and that the plaintiffs were duly appointed administrators of his estate. It is also admitted that the defendants at the time in question were engaged in the business alleged in the plaintiffs' complaint, the Lockhart Power Company engaged in generating, transmitting, and vending electric power in this State, and that the Holston Quarry Company was and is engaged in mining and quarrying stone, in the County of Cherokee at the edge of the City of Gaffney. The testimony also tends to show that the quarry company at the time in question made extensive use of electricity, in operating its said plant, including the work of pumping water from said quarry. In this connection it may be stated that one reasonable inference to be drawn from the testimony and the surrounding circumstances is that, as alleged by plaintiffs, the defendants had an agreement or arrangement with the power company whereby the power company furnished electric current to the quarry company for the purposes above set forth, and it may be reasonably inferred from the testimony that the defendant power company, or both of the defendants, built, or caused to be built, off from the main line of the power company, a spur line, consisting of uninsulated, copper wires attached to cross-arms stretched on and upon a row of wooden poles, stretched for some distance up to and into the edge of the quarry in question, to a metal shed located on the said quarry lands; and that the power company transmitted over the said lines and poles electric current for the use of the quarry company in operating its said plant as alleged by the plaintiffs. The testimony also tended to show

that the said uninsulated wires, heavily charged with electricity, as well as other wires, were connected with the said metal-covered shed and also the pole erected nearby, in such a manner as to make the same dangerous to life, especially in damp and inclement weather. In this connection we may state that it seems to be conceded, or at least not seriously questioned, that it was dangerous for any one to approach the said metal shed and pole nearby, with which the same were connected with the wires in question, when heavily charged with electricity as above alleged, especially in damp weather. The testimony shows that on the night when Carrol Sarratt was injured, which injury resulted in his death, the weather was damp, in fact, rain had been falling off and on for a number of hours, and the said poles, as well as the metal shed referred to, were damp. It also appears that the switch for turning on the current for the purpose of pumping the water from the quarry was located in the said shed, as well as the light switch in use in said place.

On the night in question, October 16, 1932, one J. H. Champion, a general utility man in the employment of the defendant Holston Quarry Company, while in the discharge of his duties as such employee, at the metal shed referred to above and the switch adjacent thereto, in the exercise of due care, without any warning, was dangerously shocked from the electric current at said place, from which he suffered greatly; was unable to be released from the grasp of the current until the switch could be pulled and the current cut loose from the main power lines; that some time passed before this could be done, and during the time he was seriously injured. Later, when the current was cut off, Champion was taken to the hospital. The testimony further tends to show that, while the said J. H. Champion was in the clutch and grasp of the electric current at said place, his cries and wails, caused by his agony and suffering, could be heard for some distance and many heard his cries; that those who heard him were prevented from going to his aid on account of the dan-

gerous electricity which surrounded him and prevented any one from rendering assistance. The people who heard his cries were afraid to approach him on account of the danger described; that, while the said J. H. Champion was thus suffering, the intestate, Carroll Sarratt, at that time employed by the City of Gaffney in connection with its light and water plant, received the news, and was urgently requested to do something to get Champion released. In response to the urgent request, in the interest of humanity and to save life, Carroll Sarratt immediately went near the scene and undertook to climb a pole that contained a cut-off, at the junction of the two lines, for the purpose of "pulling" the switch and thus cutting off the current from the main power line which would have immediately released the said J. H. Champion from the said electric grasp; that, as he ascended the pole that contained the said cut-off, the electric current that surrounded him suddenly struck and shocked him and caused him to fall from the pole and to seriously injure him, from which injury he died a short time thereafter.

Under our view of the testimony, the same tends to establish the material facts the plaintiffs alleged, and the trial Judge could not, under the law, grant the defendants' motions for a nonsuit. We think the evidence was sufficient to take the case to the jury on the issue of actionable negligence, as to both defendants, as well as the issue of contributory negligence, charged against the intestate. In this connection we call attention to the fact that not only does the testimony tend to show that the installation of the wiring system in question was defective and dangerous, but also that the defendants were given notice and had knowledge of such fact, and, further, that they took no action to remedy the perilous and dangerous condition. Further, we cannot agree with the position of the quarry company that the death of the intestate was caused by an independent, intervening, efficient agency, with which the quarry company was not connected; but on the other hand,

under our view of the testimony and the surrounding circumstances in the case, the jury could reasonably infer and conclude that the intestate's said injury, which resulted in his death, was directly due to, and proximately caused by, the joint and concurrent acts of negligence of both defendants. Also we are unable to agree with the quarry company in its contention, in effect, that the trial Judge should have held, as a matter of law, that Mr. Champion assumed or incurred the risk involved in his injury. Under the rule applicable in the case, the quarry company owed to him a duty to furnish a reasonably safe place in and about which to work, which duty could not be delegated to another, and whether, under the facts and circumstances in this case, Mr. Champion assumed or incurred the risk incident to his said injury, was an issue for the jury. *Davis v. Railroad Co.*, 150 S. C., 130, 147 S. E., 834; *Bunch v. American Cigar Co.*, 126 S. C., 324, 119 S. E., 829; *Eargle v. Sumter Lighting Co.*, 110 S. C., 560, 96 S. E., 909. It is the position of appellants that, when the intestate went to the rescue of Mr. Champion, he assumed or incurred the risk incident thereto. In this connection we may state that ordinarily a person going to the rescue of another person in danger has no higher right of protection, under the law, than the person he goes to protect or rescue. While under the general rule this is true, the action of the person who goes to the rescue of one in peril and danger must be viewed in the light of the conditions and circumstances surrounding him at the time he acts. One going to the rescue of a person in pain and suffering and in apparent danger of immediately losing his life does not, if he is a normal person, take time to think out and deliberately plan the safest way to protect himself from danger in carrying out the purpose of his act; that is, to rescue a person in danger. All that is required of him, under the law, is to act and do as the average normal person would situated under like circumstances. In accordance with appellants' contention, the testimony shows that the intestate was

a man of some experience in working with electricity, having for a number of years worked in the City of Gaffney in managing its electric light and water plant, and held such position at the time of his said injury. But on the night in question, when Mr. Champion lay prostrate, in the grasp of the electric current and heavy voltage that surrounded the said metal shed and nearby pole, with which were connected the uninsulated wires heavily charged with electricity, wailing and crying for help, in answering the request and call to render assistance in rescuing Mr. Champion from his perilous position, the intestate could not be expected, and should not be expected, to go about such task with the deliberation and calmness that one would be expected to act under a case where no suffering existed and there was no apparent need of immediate action. He should simply be required to act as any normal person would likely act under similar situation and circumstances, trying to rescue a fellow man from apparent immediate danger. The testimony tends to show that, when the intestate heard of the perilous position which Mr. Champion was in and was called to go to the scene for the purpose of rescuing Mr. Champion, he was in his home, safe from all danger, but, evidently with a desire to render immediate assistance, dressed as quickly as possible, picked up what equipment he could find at hand, and rushed to the scene of danger, or at least got close enough to hear the cries of Mr. Champion and undertook to ascend a pole that contained a switch for cutting off the deadly current, and, as he ascended for that purpose, the current struck him and caused him to fall to the ground, as herebefore stated. Whether the intestate acted with that degree of caution and prudence that he should have acted with, under the circumstances of the case, was, under our view of the case, a question for the jury. In this connection, and in support of the views we have expressed herein, we call attention to the case of *Wagner v. International Railway Co.*, 232 N. Y., 176, 133 N. E., 437, 19 A. L. R., 1 and the case of *Sanders v.*

*Railway & Lighting Company,* 159 S. C., 266, 156 S. E., 874, and authorities therein cited.

The grounds of defendants' motion for directed verdict were, in the main and in force and effect, the same as the grounds stated on the motion for a nonsuit, and are disposed of by what we stated in our consideration of the motion for a nonsuit. We may add, however, in addition to what we have stated above, that, having considered, in connection with the entire record in the cause, all grounds upon which the said motions were based, we are unable to sustain the allegations of error imputed to the trial Judge in overruling the same.

The appellants impute error to the trial Judge regarding the admission of testimony as to what certain witnesses, offered by the plaintiffs, told Mr. Sarratt, the intestate, just before he went to the scene in question on the night he was killed. The testimony complained of was the following given by Mr. Austell:

"Q. All right, when you got to Mr. Sarratt's house, did you tell him anything then? A. We told him we wanted (him) to go to the college, to the quarry, that a fellow was being electrocuted."

Also the following testimony given by the witness W. R. Lipscomb, Jr., is complained of:

"Q. In consequence of the conversation you had with Fletcher Edwards, what did you tell Mr. Sarratt over the telephone? A. I told him there was a man electrocuted at the quarry and the officers were coming by for him.

"Q. That a man was being electrocuted? A. Mr. Osborne —He was electrocuted, as I understand it.

"Q. You told him what? A. That a man had been electrocuted at the quarry and the officers were coming by for him."

It will be observed from this testimony of Mr. Lipscomb, in the telephone conversation, that the information conveyed to Mr. Sarratt was to the effect that a man had been

electrocuted and that "the officers were coming by for him"; but it appears from the testimony of Mr. Austell that, when they got to Mr. Sarratt, he told Mr. Sarratt at Mr. Sarratt's house that a man "was being electrocuted." Clearly the testimony was offered and admitted for the purpose of showing the purpose for which Mr. Sarratt went to the place in question, and what prompted him to go there. For such purpose, the testimony, in our opinion, was competent.

Appellants present quite a number of exceptions imputing error regarding the charge. Having carefully considered these exceptions in connection with the charge as a whole, we are of the opinion that the defendants were in no way prejudiced by his Honor's charge, and that the parties received a fair and impartial trial.

The exceptions are overruled, and the judgment of the lower Court affirmed.

MESSRS. JUSTICES STABLER and BONHAM concur.

MESSRS. ACTING ASSOCIATE JUSTICES W. C. COTHRAN and EUGENE S. BLEASE concur in result.